Filed 8/5/13  P. v. Morrow CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238077 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA071690) |
| v. | |
| HARVEY MORROW, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Harvey Morrow appeals his conviction for first degree murder, committed for purposes of financial gain. He was sentenced to life in prison, without the possibility of parole.

Morrow contends: the trial court erred by denying his motion to dismiss on double jeopardy grounds; the evidence was insufficient to prove premeditation and deliberation; the trial court committed various instructional errors and erroneously admitted evidence; and his sentence constitutes cruel and unusual punishment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

a. *Background information.*

Bailey Williams was a career United States Air Force officer and served as a fighter pilot in World War II. Bailey and his wife had two children: the victim, Steven B. Williams, and a daughter, Jan Williams.[1] The family resided in Hawaii. In 1963, Bailey retired from the Air Force, moved to Corona Del Mar in California, and began working for North American Rockwell in El Segundo. Jan moved to Philadelphia in 1970. At some point thereafter, Jan became disabled, and Bailey's wife died.

Steven remained in Hawaii. During the 1970's, he became a successful and prominent disc jockey at a Honolulu radio station. Douglas Johnson, a high school student, interned for Steven at the radio station in 1972, and the two became friends. Johnson subsequently moved to the mainland to attend college. In Hawaii, Steven was also acquainted with Michael Niebuhr, who worked with local bands; Sylvia Noland, an account executive at the radio station; and Robert Knight, who later became a well known photographer in the music industry.

---

[1] For ease of reference, and with no disrespect, we hereinafter sometimes refer to members of the Williams family by their first names.

Steven moved to Denver, Colorado, where he became the co-host of a highly successful and financially rewarding radio program, "Steven B. and the Hawk." Steven helped pioneer the radio "morning show" concept and was known as the "voice of the Rockies." After his stint in Denver, Steven moved to San Francisco and then back to Denver. He eventually ceased work as a disc jockey, but continued to do voiceover work. He became a gourmet cook and a wine expert.

Johnson, meanwhile, had graduated from college with a degree in Economics, gotten married, and settled in San Jose. He and Steven renewed their friendship in the 1980's and, over the ensuing years, became close friends, "like brothers." In the 1990's Steven invested in several unprofitable real estate ventures that went bankrupt; he was also delinquent in filing tax returns. Johnson assisted him with these matters. Although Steven had good intentions he was disorganized and a poor money manager.

In the summer of 2001, Steven moved to Napa and began working at a winery. In October 2001, Bailey suffered a fall inside his Corona Del Mar home and was hospitalized. For several months Steven commuted between Napa and Southern California to assist with Bailey's care. In January 2002, Steven quit his job at the winery and moved into the Corona Del Mar home to assist his father full time.

In January 2002, Bailey created a will and trust with the assistance of an attorney. Those documents divided Bailey's estate into two equal shares, half for Steven, and half for Jan. Steven's share was unrestricted, but Jan's was not. Steven was named as the trustee for Jan's half, and as the executor of the will. The trust required that Jan be provided with a one-time payment of $25,000, and then $10,000 twice a year thereafter, with a provision for additional funds for her medical and other expenses.

In July 2003, Bailey died.

b. *Morrow, Niebuhr, and the Iolair Mara*

In the late 1990's, Niebuhr, Steven's acquaintance from Hawaii, worked as the head trader at a Denver brokerage firm, Lloyd Wade Securities. Appellant Morrow was

also employed by the firm, and he and Niebuhr became friends. In 2000, the firm closed after its top managers, including Niebuhr, were accused of securities fraud.[2]

Morrow thereafter purchased a 69-foot, steel-hulled motor sailboat, the Iolair Mara, which he kept moored at the Cabrillo Marina in San Pedro. The boat was in poor condition and needed a complete overhaul. In April 2003, Niebuhr heard through a mutual acquaintance that Morrow was refurbishing the vessel and intended to sail around the world. Niebuhr was an experienced sailor and asked Morrow if he could assist with the refurbishing work and join him on the voyage. Niebuhr would be the chef, and a deck hand. Morrow agreed. Niebuhr moved to San Pedro and lived with Morrow on a boat owned by one of the carpenters who was repairing the Iolair Mara.

During the summer of 2003, after Bailey's death, Niebuhr visited Steven at the Corona Del Mar house. Morrow came along, and Niebuhr introduced the two men. Niebuhr and Morrow subsequently visited Steven on other occasions at the Corona Del Mar house. The residence was "a mess," with books, bills, and records everywhere. During one of these visits, Niebuhr and Steven stepped away from Morrow and talked privately about Steven's finances.

In August 2003, Niebuhr returned to Hawaii for three months. When Niebuhr returned to San Pedro from Hawaii in October 2003, he and Morrow moved onto the Iolair Mara. Money was "tight," and they were living "hand to mouth." In late November 2003, Niebuhr returned to Hawaii to settle his affairs before embarking on the voyage.

c. *Morrow and Steven present a fictitious promissory note to Steven's probate attorney.*

In September 2003, the same month as Bailey's memorial service, Morrow arranged an appointment for Steven with Derek Tung, a certified public accountant and tax attorney, in regard to Bailey's estate. At the time, Tung was a recent bar admittee and

---

[2]     Niebuhr pleaded guilty to securities fraud in 2004.

4

was "very new" to probate law. Morrow sat in on the meeting and did most of the talking. Bailey's estate was comprised of the Corona del Mar house; approximately $250,000 in Boeing stock; a car; and a bank account containing approximately $150,000. The house was included in the trust, but Steven sought Tung's assistance in probating the remaining assets.

During the meeting, Steven and Morrow presented to Tung a one-page "promissory note" purportedly executed in 1982, showing that Bailey had borrowed $240,000 from Morrow's father, Victor. The note, plus interest, reduced the value of the probated portion of the estate by $320,000, almost "zero[ing] out the entire probate estate," and thereby reducing the amount of federal income taxes owed. Tung was concerned about the authenticity of the note because it appeared overly simplistic for such a large transaction, and was neither witnessed nor notarized. After the meeting, Tung called Steven several times expressing his discomfort with the note. Tung encouraged Steven to decline the debt and press Morrow to prove its validity. Steven responded that Morrow was an old family friend, and the debt was "totally legit."

Steven confided to Johnson that he and Morrow were attempting to avoid tax liability on the estate by creating a fictitious note. Steven explained that Morrow had suggested they "create a fictitious note and obligation" in the form of an "I.O.U.," purportedly between Bailey and Morrow's father. The note would falsely state that the two fathers had been World War II buddies, and Morrow's father had loaned Bailey cash with the understanding it would be repaid from the trust account. Johnson advised Steven against the plan, telling him it was wrong and illegal. Steven responded, " 'Well, this kind of stuff happens all the time.' " Steven later confided to Johnson that he and Morrow had completed the fictitious note.[3]

---

[3]     In May 2006, after Steven's murder, Johnson prepared a journal documenting events he believed might be important in the investigation. Johnson included in that journal his recollection that Steven had told him he and Morrow had concocted a scheme to create a fictitious debt to lower the value of the trust.

The estate was successfully probated in Orange County Superior Court, without challenge to the note.

When Jan received the probate documents, she noticed the "I.O.U." document. The signature on the document purporting to be Bailey's was not in Bailey's handwriting. Moreover, her father's first name was misspelled "Baily" rather than "Bailey." Jan called Steven and questioned him about the document. He told her it was "a fiction created to reduce the taxable base of the estate."

d. *Morrow befriends Steven.*

In late summer of 2003, Steven began to talk regularly to Johnson about Morrow. Steven believed Morrow had been a partner in a Denver brokerage firm, and his net worth was $38 million. Steven increasingly relied on Morrow, rather than Johnson, for financial advice. Morrow invited Steven to sail around the world on the Iolair Mara once the repairs to the boat were complete. Steven would serve as the vessel's chef. Morrow had promised that if he got tired of the boat, they could purchase a restaurant in the Caribbean for him to run. Steven planned to name the restaurant "Bailey's."

Steven's friend from Hawaii, Sylvia Noland, moved to Rancho Palos Verdes in 2003 and she and Morrow began to lunch together on a biweekly basis. Steven told Noland that Morrow was a retired Wall Street financier, and was going to help him with Bailey's estate. It appeared to Noland that Steven put Morrow "on a pedestal" and thought he was "brilliant."

e. *The sale of the Corona Del Mar house and transfer of Steven's and Jan's inheritance to Morrow.*

In early 2004, Morrow began staying in the Corona del Mar house with Steven, assisting him in preparing the property for sale. The house sold in March 2004 for $1.83 million.

That same month, Steven told Johnson that the assets from his father's estate, including the proceeds from the sale of the house, cash, and stocks, had been transferred to Morrow's accounts to facilitate their movement to offshore accounts, as Morrow had

6

advised. Johnson asked Steven if "what he was doing was legal." Steven replied that "it seems to be all aboveboard."

Bank records showed that on March 1, 2004, Morrow had approximately $1,000 in his bank account. On that same date, $1,749,683 from the house sale was deposited to Bailey's trust account. In March and April 2004, three checks from the trust account, in the amounts of $320,000, $800,000, and $498,000, were deposited into Morrow's bank account. Various additional transactions between Morrow's account, Steven's account, and the trust account transpired over the subsequent months, with a resulting net gain of $1.618 million to Morrow from the trust account and Steven's personal accounts. In April 2004, $900,000 was transferred from Morrow's Bank of America account to Morrow's Bank of Bermuda account, in the name of Decca Limited. Over the next few months, these funds were moved to a second Decca account at the Bank of Bermuda, and then, in a series of transactions, were transferred back to Morrow's Bank of America account.

In the spring of 2004, Morrow increased the pace of repairs to the Iolair Mara and began to purchase expensive new equipment for the vessel. This contrasted sharply with the previous, slow pace of work and his purchase of used materials. Among other things, the vessel was repainted and re-varnished, outfitted with new teak decks, new masts, a desalinization system, a scuba diving compressor, expensive stainless steel hydraulic winches, and high-tech navigation equipment. Morrow also had a salt water wash down pump installed, which could be used to wash off the deck.

In May 2004, Niebuhr telephoned Morrow to inform him he would be arriving in San Pedro soon, in preparation for their around-the-world sail. Morrow told Niebuhr that his daughter had been sexually assaulted. Morrow purportedly found Niebuhr's response to this news to be insensitive. He told Niebuhr never to call him again, and hung up on him. Niebuhr was shocked. He tried to call Morrow numerous times thereafter, but without success.

f. *Failed investment in Orphanage Entertainment Group*

In 2004, Morrow met Leo Rossi in a coffee shop after overhearing Rossi talking with friends about a new record label he was trying to produce, the Orphanage Entertainment Group. Morrow told Rossi he could help finance the venture, and both Morrow and Steven invested in the business. After moving out of the Corona del Mar home, Morrow and Steven sublet from Rossi space in a cliffside residence in San Pedro, nicknamed the Point House. They lived there for 18 months, with Morrow's wife occasionally joining them. The Orphanage Entertainment Group failed to prosper, however. According to Rossi, Morrow failed to bring in the promised investors, and the company ceased to operate in August 2005. After an argument about the company in August 2005, Rossi told Morrow and Steven to move out of the Point House. Rossi terminated his business relationship and friendship with Morrow, but remained on good terms with Steven. Steven became a close family friend.

g. *Steven begins asking questions about his money.*

Starting in the summer of 2005, Steven began complaining that he was running short of money. He was having difficulty paying his bills and was "living on credit cards." Johnson loaned Steven $1,000. In November or December 2005, Steven complained to Johnson that he did not have access to his money, was not sure where it was, and would have to work with Morrow to obtain access. When Johnson asked whether Steven had any documentation from Morrow showing that his funds had been deposited into Morrow's account, Steven replied that "they were going to prepare the documentation, but it had never been given to him." Johnson loaned Steven an additional $10,500 in January 2006, so Steven could pay Jan the amount due to her. Steven also told Noland, in January 2006, that he was concerned because he could not get access to his money from the offshore accounts. Noland told him that seemed odd, because it should have been possible to just wire money back and forth.

In early 2006, work on the Iolair Mara was almost complete, except for the sails. Morrow and Steven began living on the boat. The boat was outfitted with, inter alia, a

8

main stateroom and a small cabin with bunk beds. Morrow and his wife were to sleep in the stateroom, and Steven resided in the small cabin.

In February 2006, Johnson and Steven spoke about the money issue again, and Steven seemed agitated. Morrow walked in during the conversation, and Steven said to him, " 'I want my fucking money.' " Morrow replied, " 'I'm working on it.' " During March and April 2006, Steven told Johnson that he intended to "have a confrontation with [Morrow], have a come to Jesus with [Morrow] about getting access to his money." Johnson understood the phrase, " 'come to Jesus,' " to mean a very direct, forceful verbal confrontation.

h. *Steven goes missing.*

Johnson got remarried in Northern California on April 15, 2006. Steven assisted him with wedding preparations. Steven appeared to be happy and supportive of Johnson's marriage. Johnson and his bride were away on their honeymoon in Europe from April 17 through May 3, 2006. Steven had plans to celebrate his upcoming 59th birthday on May 14 with the couple when they returned.

On April 21, 2006, Steven and Noland had lunch. Steven said he had no money to buy lunch or groceries. Noland bought his lunch and offered to loan him money. Steven declined and stated he would talk to Morrow when Morrow returned from a fishing trip. Steven explained, "when Harvey gets back, you know, I am going to sit down and talk to him." Steven had his passport and said he was going to ask Morrow "if we could go to whatever country [he] has my money in and get my money."

Rossi saw Steven at the Point House on May 3, 2006.[4] Steven said he was going to sail to Catalina with Morrow. They planned to motor to the back side of Catalina, and that he had "financial issues" to discuss with Morrow. Steven's frame of mind was

---

[4] Rossi initially told police, and testified at the preliminary hearing, that he last saw Steven on May 5, 2006. He later realized this was a mistake, in that he would have been travelling on May 5.

"good" and he was jovial and joking around. He did not seem depressed. Rossi left the country shortly thereafter to go on tour with a band in Italy.

In early May 2006, Morrow arranged to accompany Mark Landers, a cabinetmaker who had done work on the Iolair Mara, on a trip to Bishop, California. Morrow stated he wanted to get away from the harbor and the boat for a few days. Landers told Morrow he planned to leave on May 5, at 5:00 a.m. Morrow was supposed to meet Landers at Landers's shop, which was 10 minutes away from the marina. However, Morrow failed to arrive. Landers telephoned Morrow repeatedly and Morrow explained he had just woken up and was on his way. He finally arrived at 6:30 a.m. Morrow looked "[h]orrible," as if he had not slept in days, and his face was red and puffy. He fell asleep on the drive to Bishop. Morrow and Landers returned to Los Angeles on May 7, late in the afternoon.

When Landers was on the Iolair Mara a few days later, he noticed that Steven's cabin was "spotless" and "empty." Landers asked Morrow where Steven was. Morrow replied, "Oh, he went to Hawaii."

Sometime in early May, Paul Coles, the tradesman who had installed the salt water pump, boarded the Iolair Mara to perform some work. He found the engine room was flooded. The salt water pump had been left on, causing a plastic tube to melt and the water to leak. Based on the amount of water, he believed the pump had been on for 12 hours.

Johnson called Steven as soon as he returned from his honeymoon on May 4. Although Steven usually returned phone calls within a few hours, he never responded. Johnson grew increasingly concerned and called mutual friends to see if they had heard from Steven. On May 11 or 12, Johnson telephoned Morrow and asked where Steven was. Morrow told Johnson that he had returned to the boat one day and found Steven on the deck smoking marijuana. When Morrow confronted Steven about smoking marijuana on the boat, Steven became "pejorative," took his things, and left. Morrow believed he had gone to Mexico.

10

Between May 14 and May 19, Johnson, Rossi, Noland, and Robert Knight all attempted to contact Steven, without success. Noland called Morrow on May 19. Morrow said that all Steven's things had vanished from the boat, and Steven had said he was going to Hawaii.

i. *Steven's body is found off the coast of Catalina.*

On May 18, 2006, Donald Goodwin was sailing his motorboat from Huntington Harbor to Catalina Island when he spotted Steven's body floating face down in the water, about seven miles from Catalina, in the channel between the mainland and the island. Birds were standing on the body, pecking at the flesh. Goodwin called the Coast Guard. Catalina Deputy Sheriff James Pennington retrieved the decomposing body using a rescue boat. Steven's body was fully clothed, including a coat, gloves, and shoes. The body was bloated and discolored, and burst as it was being lifted onto the boat. Barnacles were growing on the bottom of the shoes, indicating the body had been in the water for an extended period of time.

On May 23, after an autopsy had been conducted, Steven's friend Knight alerted the coroner's office that the body might be Steven's.

j. *Morrow's flight from San Pedro.*

At approximately 9:00 a.m. on May 25, 2006, numerous law enforcement personnel boarded and searched the Iolair Mara. At the time, Morrow was off the boat and having breakfast with Gregory Labono, a welder who had done work on the boat. Ten law enforcement officers from various agencies were present, most of them in uniform. Numerous police vehicles were in the marina parking lot. A Harbor Patrol boat was parked next to the Iolair Mara, and divers searched the waters around the boat. The vessel was towed to a secure slip at Marina Del Rey at approximately 10:30 a.m.

Two of Morrow's acquaintances telephoned him to alert him to the police presence on the boat. Morrow did not seem concerned.

Rosie Rojas, the Cabrillo Marina office manager, saw Morrow walk toward the Iolair Mara at the same time police divers were walking toward the boat. Morrow

11

stopped for a second, and then walked away. Morrow never contacted authorities regarding his boat.

A safety deposit box rented to Morrow and his wife was accessed on May 25, 2006. Cellular telephone records indicated that Morrow's telephone left the Los Angeles area on May 26, 2006, at 9:48 a.m. and travelled to Las Vegas, where it stayed overnight. The following day the phone travelled on to the Nevada border.

On September 8, 2006, Morrow was hired by Pete's Auto Sales in Great Falls, Montana, as a used automobile salesman. Morrow told Joseph Parsetich, the finance manager, that he had been a stockbroker in Texas. He had moved to Great Falls because his wife and her friends had died in a tragic boating accident on their yacht, and he wanted to get as far away from "bodies of water" as possible. Morrow also asked whether Parsetich knew of a large bank in the area that could access bank accounts in the Caribbean. Parsetich, a former police officer, found Morrow's story suspicious, and researched Morrow's name on the internet. Based on his findings, he notified law enforcement authorities of Morrow's whereabouts.

k. *Morrow's interview with detectives.*

Morrow was arrested on September 20, in Great Falls. Los Angeles Sheriff's Department Sergeants Robert Martindale and Kenneth Clark interviewed him in Montana. Among other things, Morrow told them he knew his boat had been towed away, but failed to do anything in response because he was "so disgusted with the whole thing" he "left." He explained that the time and money it had taken to restore the boat took a toll on his marriage, and having the boat towed was "the last straw." He believed Steven had gone to Hawaii to work on some radio tapes. He denied knowing what had happened to Steven.

l. *The investigation.*

The medical examiner determined that Steven was killed by a single gunshot to the right side of the back of his head. The bullet had travelled from back to front, right to left, and possibly slightly upward. The coroner was unable to definitively determine the distance from which the fatal shot was fired, but skull fractures suggested a close shot,

12

not a distance shot.  In the medical examiner's opinion, the gunshot was neither self-inflicted nor accidental.

A scientist from the Natural History Museum of Los Angeles opined that the goose neck barnacles found on the bottom of Steven's shoes had been growing there for between 5 and 15 days.  Gooseneck barnacles are not often found growing on the shore.  They attach to floating things.  The barnacles would have attached to the body when it was floating, and would not have started growing until they were attached.

An expert testified that typically when a lifeless body is thrown into the water, it will sink and submerge.  It will rise to the surface when gases released during decomposition accumulate.

Pennington, the deputy sheriff who recovered Steven's body, had recovered the bodies of other victims in and around Catalina during the course of his career.  Bodies recovered close to shore show more severe predation from smaller fish, which are more numerous near shore.  They "attack the soft tissue . . . and exposed parts are eaten away." Steven's body showed very little predation other than that caused by seabirds.

Expert testimony from a University of California at Santa Barbara oceanographer on ocean currents established that if a body was placed into the surf off the coast of Catalina or off the coast of the California mainland, it would most likely be pushed back towards the shore by the waves.  Possibly a rip current could move it offshore, but  this was unlikely.

The search of the Iolair Mara did not reveal firearms or any evidence of Steven's blood.  A search of a storage locker to which Morrow had access revealed several firearms, but ballistics testing revealed that none of them were the murder weapon.  The key to Steven's car was on the boat, and his car was still parked in the marina parking lot, where it appeared to have been for some time.

After locating Morrow, police searched his Land Rover.  They discovered an LG cellular telephone that was no longer in service and a Virgin Mobile pay-as-you-go phone, with a receipt indicating it had been purchased on May 27, 2006, in Las Vegas.  Police also found a Decca Limited document embosser and a .45-caliber Cimarron six-

13

shot revolver and ammunition. The revolver was not the murder weapon. The murder weapon was never recovered.

David Van Cort, the Commodore of the Los Angeles Yacht Club located in the Cabrillo Marina in San Pedro, had often seen Morrow, who was also a club member, in the club's library. In February 2007, Cort was in the club's library doing research when he happened to open a small wooden file cabinet. Tucked in the back, behind some circa 1920's yacht club records, Cort discovered a Garmin MAP 60 GPS device, wrapped in a paper towel, with no batteries. Cort took it home, put batteries inside, and turned it on. Cort observed a "track" from the Cabrillo Marina to Catalina, behind Catalina, then a straight path back to the Marina, which he found odd. Cort was aware of Steven's death and suspected the GPS might somehow be related. He notified police.

Morrow had purchased two Garmin MAP C-60 GPS devices in 2004. Two manuals for a Garmin GPS C-60 model were found on the Iolair Mara, but the device itself was absent. Built-in navigation equipment on the boat—sonar and GPS—had never been activated.

Coast Guard Special Agent Charles Fehrman examined the GPS found in the library and extracted data from it. The GPS showed a journey beginning on May 4, 2006, at 1:17 p.m. from San Pedro to Catalina Island. The starting point corresponded with the sixth slip at the harbor, where the Iolair Mara was docked. The vessel left the yacht harbor, traversed around the back of Santa Catalina Island, and meandered around. The trip back from Catalina began at 2:14 a.m. on May 5, 2006, and concluded back in the San Pedro yacht harbor at 5:58 a.m.

Analysis of Morrow's and Steven's cellular telephone data showed that on May 4 2006, Morrow called Steven at 11:47 a.m., using a cell phone tower that provided service to the boat slip. Steven returned Morrow's call at approximately 1:00 p.m. At approximately 4:00 p.m. that day, both Morrow's and Steven's cell phones were using a cell tower located on Blackjack Mountain on Catalina, that provided service to Catalina and to boats located in the ocean halfway to the mainland. A half hour later, Morrow's phone made another call using a mainland tower. An expert opined this indicated the

14

phone was off the mainland, in an area where there was overlapping service between the Catalina tower and the mainland tower. By 5:05 a.m., Morrow's cell phone was using a cell tower located in San Pedro. There were no calls originated by Steven's cell phone after May 4, 2006. Between March 1, 2006 and May 4, 2006, Morrow's cellular telephone called Steven's cellular telephone 31 times. Morrow's cellular telephone never called or texted Steven's cellular telephone after the afternoon of May 4, 2006. All calls to Steven's phone after May 8, 2006, at 6:45 p.m. went directly to voicemail. This was consistent with Steven's phone being off, losing battery power, or being destroyed.

2. *Defense evidence.*

As relevant here, the defense presented the following evidence. Neither Morrow's DNA, nor his fingerprints, were found on the GPS device found in the yacht club library, or on the paper towel in which it was wrapped.

Morrow testified in his own behalf. The promissory note was genuine, and was created at his father's request. The initial loan of $240,000 was a blend of Morrow's own money, and his father's. The signature was on the document when he received it in the mail from his father or Bailey. He had spoken to Bailey many times on the phone. His introduction to Steven through Niebuhr was "serendipitous." After the first loan, he and his father made a second loan to Bailey because Bailey could not pay the first loan off. They negotiated the second loan for $38,00, plus appreciation on the Corona Del Mar house. The formula was the difference between the note and the final price of the house. Therefore, if the house sold for $1.8 million, Morrow would deduct the $320,000 from that and be paid the remainder of the purchase price, or approximately $1.4 million.

Steven typically "got very strange around his birthday." He got depressed, would "hide out," and did not want to be near people. He was afraid of getting older. It was "a blow to Steven" when Johnson got remarried. It appeared to Morrow that Steven was in love with Johnson.

The night before the Bishop fishing trip, Morrow spent the night on the boat. He did not take the yacht to Catalina. He was late to Lobano's because he overslept. When he returned, Steven was gone, as were his belongings. Morrow did not attempt to call

15

Steven or ascertain his whereabouts because he was "very aggravated" with Steven. Steven had, in the past, taken off without telling anyone. Furthermore, Morrow had talked to Steven about not smoking marijuana on the boat. Morrow believed Steven had gone to Hawaii, because Steven had talked about going back there to have some of his old radio tapes transferred to disk.

When he arrived at the marina and saw officers, he believed they were from a film crew. Once he realized that officers had towed the vessel, he "freaked out." He was "actually quite certain that it had probably been taken due to . . . Steven's stupidity," that is, for smoking marijuana and causing the boat to be seized for marijuana-related crimes. Morrow had found a bag of Steven's marijuana hidden under a floorboard in the boat. According to Morrow, Steven had given two men $75,000 each as startup money for marijuana farms. In Texas, where Morrow was from, "having some pot on a boat in Texas will get you 20 years." Additionally, Morrow knew Labono had been arrested in the past for attempting to smuggle undocumented aliens, and Labono had recently been on the boat. Upset, Morrow began drinking and meandered across the west, ending up in Great Falls. He told Parsetich the story about his wife drowning in order to put an end to Parsetich's nosiness.

He lived off money he had made in his previous career, which he had stored in safe deposit boxes. His wife also sent him money, and he did not need Steven's inheritance.

He denied killing Steven.

3. *Procedure.*

Trial was by jury.[5] Morrow was convicted of the willful, deliberate, premeditated, first degree murder of Williams. (Pen. Code, § 187, subd. (a).)[6] The jury found the murder was carried out for financial gain (§ 190.2, subd. (a)(1)); and Morrow personally

---

[5] As discussed *post,* Morrow's first trial ended in a mistrial.

[6] All further undesignated statutory references are to the Penal Code.

16

and intentionally used and discharged a firearm, proximately causing Williams's death (§ 12022.53, subds. (b), (c) & (d)). The trial court denied Morrow's motion for a new trial and sentenced him to life in prison without the possibility of parole, plus 25 years to life. It imposed a restitution fine, a court security assessment, and a criminal conviction assessment. Morrow appeals.

DISCUSSION

1. *Contentions related to testimony about the fraudulent note.*

a. *Additional facts.*

Morrow's first trial commenced in May 2011. During opening statement, defense counsel stated the following: "One thing the prosecutor never mentioned in his opening statement, that the facts will show in this case, is Steven Williams didn't just inherit a two million dollar pot from his father, but Steven Williams also inherited a debt from his father for several hundred thousand dollars. That debt was to Harvey Morrow. [¶] You will see the document in the trust that established that even though he inherited this money, Steven Williams also inherited a debt that his father Bailey had incurred to my client, Harvey Morrow. . . . And Steven Williams acknowledged in the trust documents that he owed Harvey Morrow several hundred thousand dollars. The prosecutor did not mention that in his slide show, but the evidence will show you that that is true."

The People called Johnson as their first witness, and his testimony continued after the lunch break. The prosecutor elicited that Steven had told Johnson several times that he wished to avoid paying taxes on the estate. At the conclusion of Johnson's direct examination, the court took a 10-minute recess. When trial resumed, the prosecutor asked to reopen, stating that he wished to explore "one more avenue" with Johnson. The prosecutor then queried whether and what Steven told Johnson about his attempts to manipulate the "books of the probate" estate. Defense counsel objected. At sidebar, the prosecutor explained Johnson would testify that Steven "agreed with Mr. Morrow to make it look like Bailey loaned Mr. Morrow money. He was going to try to reduce the value of the estate." Defense counsel asked when Johnson had given the prosecutor this information. The prosecutor replied, "Today." Defense counsel queried, "And you just,

17

without warning me, just—" The prosecutor replied, "I forgot." The trial court stated it would hold an Evidence Code section 402 hearing after Johnson was cross-examined, and struck Johnson's last response. Defense counsel cut short his cross-examination pending further exploration of the issue. Noland then testified.

The following day the trial court and parties discussed the issue before testimony began. Defense counsel had spoken with Johnson and confirmed that Johnson had not previously disclosed to detectives or the prosecutor the information about Steven's statements regarding the promissory note. The note was contained in the voluminous discovery in the possession of both parties. However, the prosecutor represented that he had been unaware of its existence. Defense counsel objected to Johnson's testimony on the grounds it was late discovery, and was hearsay. The parties discussed whether the evidence fell within an exception to the hearsay rule, and the trial court concluded the evidence was likely admissible. Defense counsel objected that "to suddenly be confronted with a defense of an issue that was never raised in the five years before" trial was prejudicial to the defense. He indicated he would move for a mistrial if the evidence was deemed admissible. He pointed out that the defense might need to have Bailey's signature authenticated. The trial court gave the parties two options: either proceed without the evidence, or allow the evidence and grant the defense request for a mistrial in order to give the defense adequate time to prepare. The prosecutor opined, "because that's such a key matter in the case and I want to use [the] piece of evidence to show that, I think that [a mistrial] might be the proper way." Accordingly, the court granted the defense mistrial request.

Prior to commencement of the retrial, at which a new prosecutor represented the People, the defense moved for dismissal on double jeopardy grounds. The trial court held a hearing on the motion. Defense counsel had questioned Johnson and determined that at the prior trial, after opening arguments, Detective Clark, the prosecutor, and Johnson met during a break in the proceedings and discussed defense counsel's opening argument. Johnson told them about Steven's statements about the promissory note. Afterwards, the prosecutor reopened direct examination and asked Johnson about the statements.

18

Defense counsel argued that the prosecutor committed misconduct by attempting to introduce the evidence without first disclosing it to the defense. Moreover, the prosecutor's ready acquiescence in the motion for mistrial suggested the prosecutor wanted the mistrial.

The new prosecutor acknowledged that the evidence should have been disclosed to the defense before Johnson was questioned about it, but opined that his predecessor failed to do so due to being in the "heat of a trial."

The trial court denied the motion. It accepted that the prosecutor had failed to review the promissory note among the trust documents; had asked Johnson about the note at lunch, after hearing defense counsel's opening statement; and Johnson first disclosed Steven's statements about the note at that time. The court ruled that the prosecutor's failure to disclose the statements to the defense before questioning Johnson was "clearly a discovery violation, but I don't believe it was intentional. But out of fairness, because of the newly-discovered evidence," the court granted the mistrial motion, in part so that the defense could retain a handwriting expert. The court reasoned: "I don't think that this rises to a prosecutorial misconduct that causes double jeopardy to attach," and denied the motion.

b. *The double jeopardy clauses of the federal and state constitutions did not bar retrial.*

Morrow contends the trial court should have granted his motion to dismiss on double jeopardy grounds. The Fifth Amendment to the United States Constitution protects defendants from repeated prosecution for the same offense. (*People v. Batts* (2003) 30 Cal.4th 660, 678 (*Batts*).) When a defendant moves for a mistrial, however, "the general rule is that the defendant's request . . . constitutes consent that waives any double jeopardy claim, and hence there is no bar to retrial." (*Id.* at pp. 679-680.) "[T]he normal and usually sufficient remedy for the vast majority of instances of prejudicial prosecutorial misconduct that occur at trial is provided under the federal and state due process clauses, and calls for either a declaration of mistrial followed by retrial, or a

19

reversal of a defendant's conviction on appeal followed by retrial." (*Id*. at p. 666, italics omitted.)

Under the federal double jeopardy clause retrial is prohibited following the grant of a defendant's mistrial motion only if the prosecution committed the misconduct with the intent to provoke a mistrial. (*Oregon v. Kennedy* (1982) 456 U.S. 667; *Batts, supra,* 30 Cal.4th at pp. 665, 682.) The California Constitution bars retrial in an additional circumstance: "when the prosecution, believing (in view of events that occurred during trial) that a defendant is likely to secure an acquittal at that trial, knowingly and intentionally commits misconduct in order to thwart such an acquittal." (*Batts*, at pp. 665-666.) "In the latter circumstance, . . . retrial is barred under the state double jeopardy clause only if a court, reviewing all of the circumstances as of the time of the misconduct, finds not only that the prosecution believed that an acquittal was likely and committed misconduct for the purpose of thwarting such an acquittal, but also determines, from an objective perspective, that the prosecutorial misconduct deprived the defendant of a reasonable prospect of an acquittal." (*Id*. at p. 666.)

In making this determination, we defer to the factual findings of the trial court if supported by substantial evidence. (*Batts, supra*, 30 Cal.4th at pp. 665, 682-683.) The "remedy mandated by the double jeopardy clause—an order barring retrial and leading to the dismissal of the criminal charges against the defendant without trial—is an unusual and extraordinary measure that properly should be invoked only with great caution." (*Id*. at p. 666.)

Applying these principles here, we discern no error in the trial court's ruling. First, the trial court's conclusion that the prosecutor did not act with the intent to cause a mistrial is supported by substantial evidence. There is no dispute that the promissory note had been turned over to the defense, and the prosecutor simply missed the document among the voluminous evidence in the case. It was also undisputed that Johnson had not told either the prosecutor or the investigating detectives about Steven's statements regarding the fraudulent nature of the note. Therefore, the prosecutor did not intentionally withhold information from the defense. Defense counsel was made aware

20

of the evidence shortly after the prosecutor learned of it, albeit in an improper manner. The prosecutor's only fault was failing to disclose the information to defense counsel before attempting to question the witness about it, and the trial court concluded the misconduct was unintentional.

Using the deferential standard mandated by *Batts* and *Oregon v. Kennedy,* we cannot say the court's ruling was unsupported by the evidence. The prosecutor would seem to have had little reason to want to provoke a mistrial: the evidence in question was favorable, not damaging, to his case. We do not agree with Morrow that the prosecutor necessarily would have needed "serious time" to investigate the new information. The new evidence was straightforward and brief: Steven told Johnson he and Morrow were concocting a fraudulent note. Contrary to Morrow's argument, discovery of the new evidence would not have required investigation of years of bank records, nor would the services of a handwriting expert necessarily have been required. Indeed, the People did not present any such evidence at the subsequent trial.

Morrow argues that the former prosecutor's assertion that he "forgot" to inform defense counsel was incredible, in light of the fact that he had an opportunity to inform defense counsel of the new information during the break, but did not, and specifically reopened direct examination to question Johnson on the issue. Morrow contends the prosecutor had to know his conduct would provoke a mistrial given that the evidence was important and would require further investigation. But given that the prosecutor was surprised by not only Johnson's testimony, but also by the note itself, and was attempting to deal with the information on the spur of the moment, in the heat of trial, we cannot say the trial court's conclusion was unsupported by the evidence as a matter of law. The prosecutor may not have thought through the ramifications of his action. He may have assumed a quick interview of Johnson by defense counsel would suffice, and failed to consider the possibility that the defense would want to conduct significant additional investigation. Indeed, at the second trial, after being given ample time to address the new evidence, the defense did not retain a handwriting expert or introduce additional evidence, such as Bailey's bank records, related to the note. The trial court appears to

have accepted the new prosecutor's argument that his colleague simply acted without thinking and forgot to properly disclose the information. As the People point out, reviewing courts do not reweigh the facts, even in the face of " 'some discomfort with the trial court findings,' " or a suspicion that the trial court " 'may have had an overly benign view of the prosecutor's naiveté.' " (*Batts, supra,* 30 Cal.4th at p. 683.) Morrow's citations to *State v. Parker* (S.C. 2011) 707 S.E.2d 799 and *State v. Rademacher* (Iowa 1988) 433 N.W. 2d 754, do not persuade us otherwise. Both are factually distinguishable from the instant matter and, in any event, are not binding on this court. (See *In re Walton* (2002) 99 Cal.App.4th 934, 946.)

Nor can we conclude the California double jeopardy clause barred retrial.[7] The record does not suggest that the prosecutor acted in order to thwart a looming acquittal, and viewed objectively, acquittal was not reasonably probable absent the misconduct. From an objective perspective, the likelihood of acquittal was slim, either before or after Morrow's counsel alerted the prosecutor to the existence of the promissory note. For one thing, as we discuss *post,* the authenticity of the promissory note would have appeared highly suspect to jurors, even without Jan's or Johnson's testimony about Steven's statements. Moreover, the prosecutor had martialed a mountain of evidence demonstrating Morrow's guilt. With or without the newly discovered testimony, and with or without additional time during which the prosecutor might have investigated the note, acquittal was unlikely. (See *Batts, supra,* 30 Cal.4th at pp. 695-696.) The proper remedy was the declaration of a mistrial, followed by a retrial. This was not the sort of extraordinary misconduct warranting a bar to retrial. "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion . . . does not bar retrial absent intent on the part of the prosecutor to

---

[7] Morrow did not allege a violation of the state double jeopardy clause separate from the federal claim. We consider the merits of the issue in light of his assertion that his counsel was ineffective for failing to raise the state claim. (See *Batts, supra,* 30 Cal.4th at p. 696.)

subvert the protections afforded by the Double Jeopardy Clause." (*Oregon v. Kennedy, supra,* 456 U.S. at pp. 675-676.)

c. *Admission of Johnson's and Jan's testimony about the fraudulent note was not prejudicial error.*

Before the second trial, Morrow filed a motion in limine seeking to exclude Johnson's and Jan's testimony regarding Steven's statements about creation of the note, on grounds that the evidence was inadmissible hearsay. After a hearing, the trial court held the testimony was admissible to explain Steven's conduct (Evid. Code, § 1250)[8] and as declarations against Steven's penal interests (Evid. Code, § 1230).[9] Prior to Johnson's testimony, the defense renewed the objection. The trial court clarified that Steven's statements made before the fraudulent note was actually created were admissible under both Evidence Code sections 1230 and 1250, and the statements made after the fraudulent note was created were admissible under Evidence Code section 1230. The trial court also found the evidence sufficiently reliable to withstand an Evidence Code section 352 challenge.

---

[8] Evidence Code section 1250 provides in pertinent part: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

[9] Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

23

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' (§ 1230.) The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) "To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.) While there is no litmus tests for trustworthiness, " 'the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures.' " (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 175.)

We independently review the trial court's ruling on the issue of reliability. (*People v. Cervantes, supra,* 118 Cal.App.4th at pp. 174-175.)

We discern no error. Steven, obviously, was unavailable. The statement that he was attempting to perpetrate a tax fraud, made to a disapproving friend and his sister, was against his penal interest in that it potentially subjected him to prosecution. Steven's statements were made to a friend and a relative in a noncoercive setting. Steven stated that Morrow suggested the idea, but Steven appears to have wholeheartedly embraced it, rationalizing that " 'this kind of stuff happens all the time.' " The statements therefore fall within Evidence Code section 1230's ambit.

Morrow contends the statements were "sparse" and "uncorroborated," and the evidence was "grossly unreliable." Among other things, he points out that Johnson and Jan did not report the conversations for years after the murder, and both were biased against Morrow.

24

We are not persuaded by Morrow's arguments, but even assuming arguendo the evidence was admitted in error, we discern no prejudice. The erroneous admission of evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 194; Evid. Code, § 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878.) There is no such probability here. Even had Jan's and Johnson's testimony on the point been excluded, it is unlikely jurors would have set much store by the promissory note. There was no evidence, other than Morrow's self-serving testimony, that his father and Bailey had been friends, let alone close enough friends that Morrow's father would have unhesitatingly loaned Bailey an extremely large sum of money. The evidence showed Morrow and Steven never met until they were introduced by Niebuhr in 2003; it was indeed a strange coincidence that Morrow just happened to meet the son of the man to whom his father purportedly loaned a great deal of money. Jan had never heard of Morrow before she attended Bailey's memorial service in September 2003—again, a strange circumstance if Morrow's father was actually a close family friend. The note itself was remarkably simplistic for such a large transaction, and Bailey's first name was misspelled—a fact the prosecutor could easily have highlighted without Jan's or Johnson's testimony. Moreover, the note, with interest, was for $320,000, but Morrow conned Steven out of nearly $2 million dollars; therefore, the note did little or nothing to explain his theft of the remainder of the estate. Morrow's testimony that he was entitled to the appreciation on the Corona Del Mar house was singularly unpersuasive. There was overwhelming testimonial and forensic evidence of guilt, which we have set forth at length in the factual summary, *ante.* The weak character of the evidence of the promissory note, juxtaposed against the mountain of evidence of guilt, demonstrates there is no likelihood Morrow would have achieved a more favorable result had the challenged evidence been excluded.[10]

---

[10]     Given our resolution of these issues, we need not reach the question of whether the evidence was properly admitted under Evidence Code section 1250.

2. *The evidence was sufficient to prove premeditation and deliberation.*

Morrow next argues that the evidence was insufficient to establish the murder was premeditated and deliberate. We disagree.

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Carrington* (2009) 47 Cal.4th 145, 186-187.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) The same standard applies when the conviction is based primarily upon circumstantial evidence. (*Zamudio*, at p. 357; *People v. Valdez* (2004) 32 Cal.4th 73, 104.)

A murder that is premeditated and deliberate is murder of the first degree. (§ 189; *People v. Burney* (2009) 47 Cal.4th 203, 235; *In re C.R.* (2008) 168 Cal.App.4th 1387, 1393.) Premeditation and deliberation requires more than a showing of intent to kill. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1083-1084.) An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*Burney*, at p. 235; *People v. Jurado* (2006) 38 Cal.4th 72, 118.) A reviewing court normally considers three types of evidence when determining whether a finding of premeditation and deliberation is adequately supported: planning activity by the defendant; motive; and the manner of killing. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663-664; *Burney*, at p. 235; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or

26

when there is evidence of motive with evidence of either planning or manner." (*Romero*, at p. 401.)  These so-called "*Anderson*" factors are not the exclusive means to establish premeditation and deliberation, and need not be present in any particular combination, or at all, to establish the evidence was sufficient.  (*Gonzalez*, at p. 663; *Burney*, at p. 235; *People v. Tafoya* (2007) 42 Cal.4th 147, 172; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127.)

The evidence here satisfied all three *Anderson* factors.  First, there was clear evidence of motive.  The evidence showed Morrow conned Steven out of his inheritance.  Just prior to the murder, Steven had been complaining to others about his lack of access to his money, and had pressed Morrow on the subject.  The jury could readily infer Morrow shot Steven to avoid liability for stealing approximately $1.8 million.

The manner of killing also supported the finding of premeditation and deliberation.  Steven was killed by a single gunshot to the back of the head.  The forensic evidence suggested the shot was fired from close range.  As the prosecutor argued, the jury could easily have inferred that Steven—who was wearing a coat and gloves—was sitting on the Iolair Mara's deck, alone with Morrow in the dark waters on the backside of Catalina, when Morrow snuck up behind him and killed him, execution-style.  (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [close-range shooting without any provocation or evidence of a struggle supported an inference of premeditation and deliberation]; *People v. Tafoya, supra,* 42 Cal.4th at p. 172; *People v. Lenart, supra,* 32 Cal.4th at p. 1127.)

The jury could also have inferred there was evidence of planning, in that Morrow brought a loaded gun onto the boat, demonstrating his preconceived plan to kill Steven.  (See *People v. Gonzalez, supra*, 54 Cal.4th at p. 664 [fact defendant brought a loaded rifle to ambush site supported an inference of planning]; *People v. Lee* (2011) 51 Cal.4th 620, 636 [fact defendant brought a loaded handgun indicated he had considered the possibility of a violent encounter].)  While this, by itself, would have been enough to indicate planning, the jury could also have inferred that Morrow prearranged the trip to Bishop to provide him with an alibi.  It could also have inferred Morrow chose an

opportune time for the murder, when Steven's close friend Johnson—whom he talked to on practically a daily basis—was out of the country on his honeymoon. In short, there was ample evidence supporting the jury's premeditation and deliberation finding.

3. *Purported instructional errors.*

Morrow contends the trial court made a variety of instructional errors. His contentions lack merit.

a. *The trial court did not err by refusing to instruct the jury on voluntary manslaughter.*

The defense requested that the trial court instruct the jury on voluntary manslaughter on heat of passion and imperfect self-defense theories. The trial court refused the instructions, concluding there was no evidence to support either theory. Morrow complains that omission of the requested instructions violated his rights to due process, a fair trial, the right to present a defense, and to have the jury determine all issues. We disagree.

A trial court must instruct the jury, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Abilez* (2007) 41 Cal.4th 472, 517; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) Instructions on a lesser included offense must be given when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense, but not the charged offense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Cook* (2006) 39 Cal.4th 566, 596.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*Manriquez*, at p. 584; *People v. Benavides* (2005) 35 Cal.4th 69, 102.) In deciding whether there is substantial evidence of a lesser included offense, we do not evaluate the credibility of the witnesses, a task for the jury. (*Manriquez*, at p. 585.) We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Booker* (2011) 51 Cal.4th 141, 181; *Manriquez*, at p. 587; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

28

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a); *People v. Manriquez, supra*, 37 Cal.4th at p. 583.) Voluntary manslaughter is the intentional but nonmalicious killing of a human being. (*People v. Moye, supra*, 47 Cal.4th at p. 549; *People v. Benavides, supra,* 35 Cal.4th at p. 102; § 192, subd. (a).) Voluntary manslaughter is a lesser included offense of murder. (*Manriquez*, at p. 583; *People v. Lee* (1999) 20 Cal.4th 47, 59.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*Manriquez*, at p. 583; *Lee*, at pp. 58-59.)

No evidence supported a heat-of-passion theory in the instant matter. "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.) The provocation that incites the defendant to homicidal conduct must be caused by the victim or be conduct reasonably believed by the defendant to have been engaged in by the victim. (*People v. Manriquez, supra*, 37 Cal.4th at p. 583.) It may be physical or verbal, but it must be sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Id*. at pp. 583-584; *People v. Lee, supra*, 20 Cal.4th at p. 59.) No specific type of provocation is required, and the passion aroused need not be anger or rage, but can be any violent, intense, high-wrought or enthusiastic emotion other than revenge. (*People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704.)

Morrow testified he did not motor to Catalina with Steven on the night of May 4th. Instead, when he got back from Bishop, Steven was gone. There was therefore no evidence about Morrow's state of mind and no evidence he was acting "under 'the actual influence of a strong passion' " when he shot. (*People v. Moye, supra,* 47 Cal.4th at p. 550; *People v. Manriquez, supra*, 37 Cal.4th at p. 585.) Moreover, there was no evidence from which a jury could have concluded Steven did anything that amounted to

29

legally adequate provocation. There was no evidence Steven physically attacked, taunted, or threatened Morrow, or engaged in any provocative conduct toward him whatsoever. There was no history of violence between the men. The fact they had had previous verbal disagreements does not come close to providing evidence that Steven provoked Morrow. In any event, given that Morrow conned Steven out of his and Jan's inheritance, even a vehement demand for his money back could not have amounted to legally adequate provocation. "The trial court is not required to present theories [that] the jury could not reasonably find to exist." (*People v. Oropeza, supra,* 151 Cal.App.4th at p. 78.)

Nor was there evidence that would have supported an imperfect self-defense theory. Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury. (*People v. Booker, supra,* 51 Cal.4th at p. 182; *People v. Cruz* (2008) 44 Cal.4th 636, 664.) There was no evidence whatsoever presented regarding Morrow's actual state of mind. There was no evidence Steven physically attacked Morrow or said or did anything that could have caused Morrow to actually believe he was in danger. There was evidence Steven owned a gun; but clearly he did not have it with him on the night of the murder, because it was later recovered from Point House. There was no evidence of a struggle or fight. To the contrary, Steven was shot in the back of the head, negating any possible inference the killing occurred during an altercation. That the medical examiner detected a small amount of alcohol in Steven's body does not provide evidence in support of the instruction. The amount of alcohol was small at best; and even if Steven had had a drink on the boat, this fact, without more, does not provide any evidence he threatened Morrow. A court is not obliged to instruct on theories that lack substantial evidentiary support (*People v. Burney, supra,* 47 Cal.4th at p. 246; *People v Johnson* (2009) 180 Cal.App.4th 702, 707), nor should it give instructions based solely on conjecture and speculation. (*People v. Young* (2005) 34 Cal.4th 1149, 1200; *People v. Mendoza* (2000) 24 Cal.4th 130, 174.) Because the evidence of heat of passion, legally adequate provocation, and an actual belief in the need to defend was lacking, the trial court

properly omitted instructions on voluntary manslaughter. (*People v. Manriquez, supra*, 37 Cal.4th at p. 586.)

        b. *The flight instruction was proper.*

        The trial court instructed the jury with CALJIC No. 2.52, as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." Morrow complains that instruction with CALJIC No. 2.52 was error because (1) there was insufficient evidence of flight, and (2) the instruction improperly lowered the prosecution's burden of proof. Neither contention has merit.

        The People urge that Morrow has forfeited this claim by failing to object below. Morrow counters that the purported instructional error implicates his substantial rights (§ 1259), and, if counsel's failure to object resulted in forfeiture, counsel provided ineffective assistance. Accordingly, we address the merits. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Felix* (2008) 160 Cal.App.4th 849, 857-858.)

        A trial court must instruct on the principles of law relevant to the issues raised by the evidence, but errs by giving an instruction that has no application to the facts of the case. (*People v. Hamilton* (2009) 45 Cal.4th 863, 937; *People v. Cross* (2008) 45 Cal.4th 58, 67.) Whenever the prosecution relies upon evidence of flight as tending to show guilt, the trial court is statutorily required to instruct the jury with the principles embodied in CALJIC No. 2.52. (§ 1127c; *People v. Wallace, supra,* 44 Cal.4th at p. 1074; *People v. Richardson* (2008) 43 Cal.4th 959, 1020; *People v. Howard* (2008) 42 Cal.4th 1000, 1020.)

        A flight instruction is properly given if the jury could reasonably infer that the defendant departed the crime scene under circumstances suggesting his movement was motivated by a consciousness of guilt. (*People v. Howard, supra,* 42 Cal.4th at p. 1020; *People v. McWhorter* (2009) 47 Cal.4th 318, 376; *People v. Bradford* (1997) 14 Cal.4th

31

1005, 1055; *People v. Visciotti* (1992) 2 Cal.4th 1, 60.) " ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citations.] '*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so.' [Citation.]" (*Bradford*, at p. 1055; *People v. Avila* (2009) 46 Cal.4th 680, 710; *People v. Wallace, supra,* 44 Cal.4th at p. 1074.) The defendant's flight need not immediately follow the crime in order to warrant the instruction. (*Howard,* at p. 1021.)

We turn first to Morrow's contention that there was no factual basis for the instruction, and that the trial court " 'confuse[d] a mere departure from the scene of a crime with a deliberate flight.' " It did not. In fact, as the prosecutor argued during closing, there was ample evidence to support the instruction. After Steven's body had been recovered and identified, police boarded and searched the Iolair Mara. Morrow walked towards the boat and turned around and left when he saw the police activity. Rather than continuing on to the boat, or attempting to discern the reason for the police visit, Morrow simply turned and walked away. Cell phone records showed that the next day he travelled to Las Vegas, and thereafter to the eastern border of Nevada. Morrow never returned to his boat, which he had been painstakingly refurbishing for several years. He broke off contact with friends and acquaintances in the San Pedro area. He resettled in Montana, and became a car salesman. Nothing suggests that either Las Vegas or Montana were "familiar environs" for Morrow. The jury could easily, and reasonably, have inferred that Morrow fled "when he concluded that suspicion had focused on him" after observing police around the boat. (*People v. Howard, supra,* 42 Cal.4th at p. 1021.) The facts that he was not formally accused of the crime, did not run from the scene, and did not leave in a hasty or "untoward manner," were of no moment. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1243 [section 1127c "was enacted to abolish the common law rule that the jury could not be instructed on flight unless there was evidence defendant knew he had been accused"]; *Howard*, at pp. 1020-1021; *People v. Carter*

32

(2005) 36 Cal.4th 1114, 1182; *People v. Avila, supra,* 46 Cal.4th at p. 710; *People v. McWhorter, supra,* 47 Cal.4th at pp. 376-377.) "The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson, supra,* 43 Cal.4th at p. 1020.)

Morrow's argument that CALJIC No. 2.52 "erect[ed] an irrational permissive inference of guilt of murder and the special circumstance," improperly reducing the People's burden of proof, fares no better. He makes two arguments in support of this contention. First, he urges that the flight instruction was improper because an alternative explanation for his departure existed, in that he might have been attempting to escape arrest for "other separate crimes by others involving the boat (smuggling and marijuana crimes)[,] which [he] testified he feared he would be caught up in." However, as our Supreme Court has explained, " 'the instruction given adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt.' " [Citation.] Contrary to defendant's assertion, the instruction properly allowed 'the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply.' [Citation.]" (*People v. Avila, supra,* 46 Cal.4th at p. 710.)

Second, Morrow argues that evidence of flight had no bearing on his state of mind at the time of the murder, and thus had no relevance to determination of the truth of the special circumstance allegation and the degree of the murder. From this, he appears to reason, the flight instruction improperly "suggested some official sanction or prima facie determination" that his flight indicated "consciousness of guilt of special circumstance murder." But Morrow's conclusion does not follow from his premise, and the instruction is not susceptible to his characterization of it. Our Supreme Court has "repeatedly rejected" contentions that standard jury instructions on consciousness of guilt, including CALJIC No. 2.52, permit or invite the jury to "draw irrational inferences about a defendant's mental state during the commission of the charged offenses." (*People v. Jurado, supra,* 38 Cal.4th at p. 125; *People v. Howard, supra,* 42 Cal.4th at p. 1021; *People v. Avila, supra,* 46 Cal.4th at p. 710 ["a flight instruction does not create

33

an unconstitutional permissive inference or lessen the prosecutor's burden of proof"]; *People v. McWhorter, supra,* 47 Cal.4th at p. 377.) Because CALJIC No. 2.52 "correctly stated the law and did not invite the jury to draw irrational inferences about defendant's mental state," use of the instruction was proper. (*Jurado*, at pp. 125-126.)

Even assuming arguendo that the instruction was given in error, it was manifestly harmless under any standard. "The instruction did not assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it." (*People v. Carter, supra,* 36 Cal.4th at pp. 1182-1183; *People v. Richardson, supra,* 43 Cal.4th at p. 1020; *People v. Visciotti, supra,* 2 Cal.4th at p. 61.) The jury was told to disregard any instruction "which applies to facts determined by you not to exist." (CALJIC No. 17.31.) Further, CALJIC No. 2.52's cautionary nature benefits a defendant, " 'admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]' " (*People v. Boyette* (2002) 29 Cal.4th 381, 438-439; see *People v. Henderson* (2003) 110 Cal.App.4th 737, 742.)

c. *CALJIC No. 2.21.2.*

Over defense objection the trial court instructed with CALJIC No. 2.21.2, which advised the jury: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." Morrow argues that the instruction violates due process and lessens the prosecution's burden of proof, because it allows dispositive credibility issues to be resolved under a probability standard, rather than by proof beyond a reasonable doubt.

As Morrow acknowledges, his contentions have been repeatedly rejected by the California Supreme Court. (E.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 714; *People v. Friend* (2009) 47 Cal.4th 1, 53.) We are not at liberty to ignore these authorities, which compel rejection of Morrow's claim. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

d. *CALJIC No. 2.90.*

The trial court instructed the jury with CALJIC No. 2.90, one of the standard reasonable doubt instructions.[11]  Morrow argues that "the archaic and incomplete 'abiding conviction' language" in the instruction suggested to jurors that the reasonable doubt standard was "akin to clear and convincing evidence," thereby denying him due process of law and a fair trial.

Morrow's contention has been forfeited because he failed to object to the instruction below.  (See *People v. Stone* (2008) 160 Cal.App.4th 323, 331.)  Apart from the issue of waiver, Morrow's claim fails on the merits.  CALJIC No. 2.90 does not misstate the proof beyond a reasonable doubt standard.  Under both state law and the federal Constitution, a trial court must inform the jury that before it may convict a defendant, it must find the prosecution has proved all elements of the charged offense beyond a reasonable doubt.  (*People v. Aranda* (2012) 55 Cal.4th 342, 349, 356; Evid. Code, § 502.)  A trial court "ordinarily satisfies this obligation" by instructing with either CALJIC No. 2.90, or CALCRIM No. 220, the standard instructions on the subject. (*Aranda,* at pp. 349, 353.)  "[T]he United States Supreme Court has approved CALJIC No. 2.90's language (*Victor v. Nebraska* (1994) 511 U.S. 1, 14-15), and appellate courts in California, including [the California Supreme Court], have found no constitutional infirmity in the language of CALJIC No. 2.90 or its similarly worded successor, CALCRIM No. 222.  [Citations.]"  (*People v. Taylor* (2010) 48 Cal.4th 574, 631; see, e.g., *People v. Friend, supra,* 47 Cal.4th at p. 53; *People v. Whisenhunt* (2008) 44 Cal.4th

---

**11**    That instruction, as given to the jury, provided:  "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  [¶]  Reasonable doubt is defined as follows:  It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

174, 221; *People v. Freeman* (1994) 8 Cal.4th 450, 501–505.)  Because CALJIC No. 2.90 was not defective, Morrow's counsel did not perform inadequately by failing to object. Counsel is not ineffective for failing to make meritless objections or frivolous motions. (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)  Morrow's claim must therefore be rejected.[12]

4. *Cumulative error.*

Morrow contends that the cumulative effect of the purported errors deprived him of a fair trial.  As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

5. *Morrow's sentence does not amount to cruel or unusual punishment.*

At sentencing, defense counsel requested that the trial court impose a sentence of life in prison *with* the possibility of parole.  Counsel acknowledged that the court lacked authority to strike the jury's special circumstance finding or impose a sentence of anything other than life in prison *without* the possibility of parole (LWOP).  However, counsel argued that given Morrow's age, an LWOP sentence amounted to cruel and unusual punishment.  The trial court noted that the crime involved planning and sophistication, and Steven was especially vulnerable because he trusted Morrow. Accordingly, the court imposed the statutorily-mandated LWOP sentence.

Morrow now renews his complaint that the LWOP sentence is unconstitutionally cruel and unusual.  This  contention is meritless.  The statutory penalty for murder with special circumstances is death or life imprisonment without the possibility of parole. (§ 190.2; *People v. Mora* (1995) 39 Cal.App.4th 607, 614.)  A trial court has no discretion to strike a special circumstance finding to reduce punishment.  (*Mora*, at pp. 614-615.)  A statutorily mandated punishment may violate the constitutional

_____

[12]     Morrow acknowledges that California courts have approved CALJIC No. 2.90, and raises the issue here to exhaust his state remedies.

36

prohibition on cruel or unusual punishment if it is grossly disproportionate to a particular defendant's individual culpability. (*People v. Felix* (2003) 108 Cal.App.4th 994, 999; *Mora*, at p. 615.) But "[b]ecause choosing the appropriate penalty is a legislative weighing function involving the seriousness of the crime and policy factors, the courts should not intervene unless the prescribed punishment is out of proportion to the crime." (*Felix*, at pp. 999-1000.) Reduction of sentence is the exception, not the rule. (*Mora*, at p. 615; *Felix*, p. 1000.) Whether a punishment is cruel or unusual is a question of law, but we review the underlying facts in the light most favorable to the judgment. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358; *Mora*, at p. 615.)

A punishment violates the California Constitution if, " 'although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478; *In re Lynch* (1972) 8 Cal.3d 410, 424; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.) In making such a determination, we consider the nature of the offense and the offender. (*Dillon*, at p. 479; *Haller, supra,* at p. 1092.) We evaluate the totality of the circumstances surrounding the commission of the current offense, including the defendant's motive, manner of commission of the crime, the extent of the defendant's involvement, the consequences of his or her acts, and his or her individual culpability, including factors such as age, prior criminality, personal characteristics, and state of mind. (*People v. Felix, supra,* 108 Cal.App.4th at p. 1000; *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.) A sentence violates the federal Constitution only if it is "grossly disproportionate" to the severity of the crime. (U.S. Const., 8th Amend.; *Graham v. Florida* (2010) 130 S.Ct. 2011, 2021; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076.)

Nothing suggests Morrow's sentence is disproportionate to his crime. He committed the most serious offense possible: first degree murder. (See *Graham v. Florida, supra,* 130 S.Ct. at p. 2027.) "The Constitution does not forbid even the death penalty (and here defendant received the lesser penalty of life imprisonment without parole [citation]) for a person who was not the actual killer and did not actually intend to

37

kill, but who was a major participant in the underlying felony, acting with reckless indifference to human life." (*People v. Mora, supra,* 39 Cal.App.4th at p. 616, citing *Tison v. Arizona* (1987) 481 U.S. 137, 152; see *Harmelin v. Michigan* (1991) 501 U.S. 957, 996 [LWOP sentence for possession of 672 grams of cocaine was not cruel and unusual]; *Solem v. Helm* (1983) 463 U.S. 277, 290, fn. 15 [no sentence of imprisonment would be disproportionate for felony murder]; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 [imposition of a sentence of life without the possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either the California or federal Constitutions].) Here, of course, Morrow *was* the actual killer and *did* intend to kill. Thus, nothing about either the offense or the offender suggests the LWOP sentence was disproportionate.

Morrow's arguments to the contrary are not persuasive. His citation to *People v. Dillon, supra,* 34 Cal.3d 441, is unavailing. Morrow was not, like Dillon, an unusually immature 17-year-old high school student, nor did he shoot in panic when faced with a shotgun-toting guard protecting an illicit marijuana crop. (See *People v. Luparello* (1986) 187 Cal.App.3d 410, 447.) Morrow's crime was instead the culmination of a sophisticated, planned murder undertaken in cold blood with the goal of getting away with the theft of Steven's and Jan's sizeable inheritance. As we have explained *ante*, contrary to Morrow's argument the evidence of premeditation was overwhelming, and the evidence of provocation was nonexistent.

Morrow's citation to cases addressing the constitutionality of LWOP sentences for juvenile offenders is inapposite. Morrow was not a juvenile when he killed Steven, and the analysis in the cited cases was based in large part on the differences between juvenile and adult offenders, such as a juvenile's lessened culpability and greater capacity for change. (See *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455, 2460, 2469]; *Graham v. Florida, supra,* 130 S.Ct. at p. 2026; *People v. Caballero* (2012) 55 Cal.4th 262, 266-269.)

Morrow urges that the state has no interest in keeping him incarcerated once he has reached an advanced age and is " 'no longer likely to offend again.' " But the

38

Legislature has expressly declared that the purpose of imprisonment for crime is punishment (§ 1170, subd. (a)(1)), and we have no basis upon which to conclude Morrow's advancing age would insulate society from potential future crimes. Although he had no prior felony record, in his mid-50's he spent years fleecing a purported friend and his disabled sister, and then committed murder to cover up the theft. Under these circumstances his lack of record is not a mitigating factor. (See *People v. Felix, supra,* 108 Cal.App.4th at p. 1001.) Morrow complains that his sentence is cruel and unusual because he will not be eligible for release under any circumstances, not even for compassionate release so he could "die with [his] family" should he develop a terminal illness. But this circumstance is inherent in all LWOP sentences, and does not demonstrate disproportionality. Morrow's victim, of course, never had the chance to grow old with his family or friends at all. Given the nature of the offense and the offender, Morrow's sentence is neither cruel nor unusual. There is nothing disproportionate about requiring him to spend the rest of his life in prison.

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.

40